## Affidavit of Gregory T. Erkins

STATE OF ALASKA              )
                             ) ss.
THIRD JUDICIAL DISTRICT      )

I Gregory T. Erkins attest to the following based on personal knowledge.

1. I have been a real estate agent since September 27, 1984, an associate broker since March 7, 1989, and the broker of my own company since August 31, 1989 in the State of Alaska. I understand basic principles of agency and recognize that a real estate agent could be an agent for the buyer, the seller or possibly both in some states.
2. I am also a computer programmer who designs programs that provide market analysis, cost analysis, payment calculations, forms generation, relational databases, and formula generation for other programmers, among other programs.
3. In my work designing computer programs, I created a matrix design to show prospective buyers that if they pay an additional $49 at the time of purchase of a home, they could save as much $30 or more a month because of reductions in interest rates.
4. I created a computer program for conventional real estate loans and help my clients save PMI (private mortgage insurance) by tailoring their down payments. The table shows them how they can structure the transaction so that the seller pays their costs. Those costs are then factored into the percentage down payment, thus saving PMI.
5. I am generally risk-averse and always calculate the likely risk versus possible reward. I purchase goods and services including insurance after a careful review of the costs and benefits.
6. In the late 1970's and early 1980's when I owned and operated a boat as a commercial fisherman, I purchased Boatowner's Insurance from Allstate Insurance and from other companies. Other commercial fishermen went bare.
7. In the early 1990's, I transferred from Horace Mann Insurance to Allstate Insurance for my Homeowner's Insurance policy after a review of the costs and the coverage of each policy.
8. On March 2, 1994, I purchased Business Liability with $1,000,000 Comprehensive Liability and $100,000 Fire and Specific Peril Legal Liability. The coverage also included $20,000 Replacement Cost for Business Contents with Multiple Endorsements from Allstate Insurance.
9. Prior to end of 1996, I arranged for Gail Greene from Allstate Insurance to speak regarding the ins and outs of insurance to a meeting of real estate brokers, namely the Independent Brokers Association (IBA), which I facilitated. She suggested requesting higher deductibles

        as a way to greatly reduce one's premium. In addition, she noted that higher top end coverage is available for only a nominal premium increase.

10. I increased my Automobile Insurance for UIM/UM to $250,000/$500,000/$100,000 for an additional $31.90 for six months, coupled with an increase in the Homeowner's Insurance coverage.

11. On November 20, 1996, I placed a $1,000,000 umbrella policy with Allstate Insurance in addition to the Homeowner's and Automobile Insurance. The policy was issued on January 2, 1997 pursuant to Allstate Insurance's invoice with coverage for a year to November 20, 1997.

12. Even though I had no employees, I purchased Workers Compensation and Employers Liability Insurance during the period of 1994, 1995, and 1996 when I engaged agents who were associated under my brokerage license who were neither related nor owners of the company. There was some debate regarding whether this coverage was required or not, yet I placed it.

13. Since prior to 1995, I maintained an accidental death policy with a minimum of $500,000. I have since increased the policy to provide $1,000,000 in coverage and $1,500,000 when flying.

14. In my efforts to place personal and business insurance, I always sought to maintain the same or greater insurance protection while seeking the best bargain.

15. I felt protected by the insurance agents and regarded them as dual agents similar to dual agents in real estate. The agents represented the insurance company and knew its products and services. They were also listening to my concerns and protecting my interests.

16. When I hear the word "agent" I think in terms of candor, fiduciary duty, and loyalty to the client.

17. In late 1998, I noticed an advertisement on television for AIG insurance that claimed an individual could save hundreds of dollars. The advertisements are similar to the AIG advertisements that are running on television today.

18. Whenever I called AIG, I was directed to an individual who was described as an "Alaska agent."

19. When the Alaska agent asked me about my policies, I described to him my coverage at the time. I described to him my umbrella policy, but he said that although he could not provide an umbrella policy he could provide comparable protection. He provided a very appealing price that he said provided coverage "comparable to what I had with Allstate." He said that AIG was ranked very highly and would provide similar protection. I recall talking to this agent about fishing on the Kenai River for salmon.

20. Throughout my dealings with AIG, whenever I called AIG for advice or assistance, I always was told that I was being transferred to an Alaska agent to handle my questions.

21. I believed these Alaska agents engaged by AIG also were working with me and promoting my best interest.

22. I was hit by a driver who went through a red light in March 2000.
23. The accident injured my back, neck and head. The injury has left me able only to work sporadically and then without completely focusing on the job.
24. After the automobile accident in March, 2000, AIG sent letters regarding medical payments and policy payment notices in same style, type and size of envelope.
25. While I was recuperating, an AIG payment notice arrived in the U.S. mail.
26. One of the envelopes was similar to the other envelopes that cancelled my insurance for missing a small payment.
27. When I called AIG, AIG refused to provide coverage even though I stated that I was injured and convalescing.
28. I was fortunate to obtain insurance with GEICO and then The Hartford at better rates.
29. Both GEICO and The Hartford explained the terms and conditions of each option and the costs in much more detail.
30. I had and currently have a $500,000/$1,000,000/$100,000 Personal Auto Policy with $100,000 medical payments and UM/UIM of $250,000/$500,000/$100,000 that is slightly less costly and provides more coverage than AIG.
31. This coverage is supplemented with a $2,000,000 Personal Umbrella Liability Policy which provides similar protection with Allstate Insurance.
32. If AIG had presented me with the costs and coverage in writing, I would have purchased the $1,000,000/2,000,000 UM/UIM coverage.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Gregory T. Erkins

SUBSCRIBED AND SWORN to me this 9th day of May, 2005

_____
NOTARY PUBLIC in and for Alaska
My Commission Expires: 10/05/07